**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

HAWKEYE COMMODITY
PROMOTIONS, INC.,

        Plaintiff,

vs.

THOMAS J. MILLER, in his official
capacity as the Attorney General of the
State of Iowa, and KEVIN W.
TECHAU, in his official capacity as the
Commissioner of the Iowa Department of
Public Safety,

        Defendants.

No. C-06-2026-LRR

**TRIAL ORDER**

_____

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.    **PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

III.   **JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

IV.   **FINDINGS OF FACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
      A.    *The History of Touchplay* . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
      B.    *The Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**
      C.    *Documents Authored by the Lottery* . . . . . . . . . . . . . . . . . . . . **12**
      D.    *HCP's Business* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
      E.    *The Ban* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

V.    **COUNT III – IMPAIRMENT OF CONTRACT** . . . . . . . . . . . . . . . . . . . **17**
      A.    *The Contract Between HCP and the Lottery* . . . . . . . . . . . . . . . **20**
          1.   *Whether there is a substantial impairment on a pre-existing*

*contractual relationship?* . . . . . . . . . . . . . . . . . . . . . . . . **21**
    *a.*     **Whether a contractual relationship exists?** . . . . . . . . **21**
        *i.*     *Offer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**
        *ii.*     *Acceptance* . . . . . . . . . . . . . . . . . . . . . . . **25**
        *iii.*     *Consideration* . . . . . . . . . . . . . . . . . . . . **25**
        *iv.*     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . **26**
    *b.*     **Whether the change in the law impairs that contractual relationship?** . . . . . . . . . . . . . . . . . . . . . **27**
    *c.*     **Whether the contractual impairment is substantial?** . . **28**
        *i.*     *Nature of the impairment* . . . . . . . . . . . . . . **29**
        *ii.*     *Previous regulation* . . . . . . . . . . . . . . . . . . **29**
  **2.** **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**
**B.**     **The Location Contracts** . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

**VI.**     **COUNT I – THE TAKINGS CLAUSE** . . . . . . . . . . . . . . . . . . **34**
  **A.**     **Property Rights** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**
    **1.**     **Machines** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**
    **2.**     **Business** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**
        *a.*     **Business itself** . . . . . . . . . . . . . . . . . . . . . . . **37**
        *b.*     **Continuing to operate the business** . . . . . . . . . . . **38**
    **3.**     **Contracts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**
    **4.**     **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**
  **B.**     **Taking** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **41**
    **1.**     **Per se takings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**
        *a.*     **Permanent physical invasion** . . . . . . . . . . . . . . **42**
        *b.*     **All economically beneficial use** . . . . . . . . . . . . . **43**
    **2.**     **Penn Central** *analysis* . . . . . . . . . . . . . . . . . . . . . . . **44**
        *a.*     **Economic impact** . . . . . . . . . . . . . . . . . . . . . . **45**
        *b.*     **The character of the governmental action** . . . . . . . . **46**

**VII.**    **COUNTS II & IV – FOURTEENTH AMENDMENT** . . . . . . . . . . . . **48**
  **A.**     **Equal Protection Clause** . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**
  **B.**     **Due Process Clause** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **52**

**VIII.**  **PERMANENT INJUNCTION** . . . . . . . . . . . . . . . . . . . . . . . **53**

**IX.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **54**

## I. INTRODUCTION

Plaintiff Hawkeye Commodity Promotions, Inc. ("HCP") is a company that owns 724 TouchPlay lottery machines ("TouchPlay Machines") and operates 572 of them in the State of Iowa ("the State"). On March 20, 2006, Senate File 2330 was signed into law by Iowa Governor Thomas J. Vilsack. The new law amends part of Iowa Code chapter 99G, the chapter governing the Iowa Lottery Authority ("the Lottery"). HCP seeks to enjoin Defendants from enforcing Iowa Code chapter 99G, as amended by Senate File 2330, because the amendment will make it illegal for "retailers" to offer TouchPlay Machines to the public after May 3, 2006 at 11:59 p.m. HCP also seeks a declaratory judgment that Senate File 2330 is unconstitutional as applied to HCP.

The matters before the court are HCP's Motion for Preliminary Injunctive Relief (docket no. 4) and the Second Amended Complaint for Declaratory and Injunctive Relief (docket no. 32). The court held a bench trial in this case on April 12, 2006. Attorneys Paula Lynn Roby and Roger J. Marzulla appeared on behalf of HCP. Deputy Attorney General Julie F. Pottorff and Assistant Attorney General Robert K. Porter represented Defendants.

## II. PROCEDURAL BACKGROUND

On April 5, 2006, HCP filed a Complaint for Declaratory and Injunctive Relief against the Iowa Lottery Authority and four Iowa officials in their official capacities—Governor Vilsack, Attorney General Thomas J. Miller ("Attorney General Miller"), Iowa Department of Public Safety Commissioner Kevin Techau ("Commissioner Techau") and Chief Executive Officer of the Lottery, Dr. Edward Stanek. The Complaint includes claims brought pursuant to 42 U.S.C. § 1983 for violations of the takings clauses,

the equal protection clauses, the due process clauses and the contract clauses of the Iowa Constitution and the United States Constitution. HCP also asserted a claim for breach of contract.

On the same date, HCP filed a Motion for Preliminary Injunctive Relief ("Motion"). On April 6, 2006, the court held a status hearing regarding the Motion. At that status hearing, the court utilized Federal Rule of Civil Procedure 65(a)(2) and determined that the hearing on the Motion would be consolidated with an April 12, 2006 trial on the merits of the Complaint. *See* Fed. R. Civ. P. 65(a)(2) ("Before or after the commencement of the hearing on an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application.").

On April 11, 2006, Defendants filed a Motion to Dismiss. Citing the Eleventh Amendment and 42 U.S.C. § 1983, Defendants sought to dismiss each of the state law claims and the Lottery as a party-defendant. Just before the trial on April 12, 2006, HCP filed an Amended Complaint, eliminating the state law claims. During the trial, HCP's counsel represented that, although HCP had intended to eliminate the Lottery as a party-defendant from the caption of the Amended Complaint, it inadvertently neglected to do so. On April 13, 2006, HCP filed a Second Amended Complaint naming only the four individuals as defendants.

On April 14, 2006, Defendants filed Defendants' Brief in Support of Resistance to Plaintiff's Request for Preliminary and Permanent Injunction (docket no. 33). In footnote one of the brief, Defendants represented that "Plaintiff agreed to remove the remaining individual defendants from this suit." On April 17, 2006, when HCP filed its Reply Brief,

it listed only Attorney General Miller and Commissioner Techau as defendants (docket no. 38). Therefore, only Attorney General Miller and Commissioner Techau remain as defendants in this suit.

## III. JURISDICTION

Because HCP raises claims pursuant to the Declaratory Judgment Act (28 U.S.C. § 2201 *et seq.*), the Fifth Amendment of the Constitution, the Fourteenth Amendment of the Constitution, Article I of the Constitution, 42 U.S.C. § 1981 and 42 U.S.C. § 1983, this court has federal question subject-matter jurisdiction over this matter. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); *see also* 28 U.S.C. § 1343(a) (providing that district courts have original jurisdiction over certain civil rights actions).

The court also has jurisdiction over Defendants Attorney General Miller and Commissioner Techau. The Eleventh Amendment of the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit . . . commenced or prosecuted against one of the United States by Citizens of another State . . . ." U.S. Const. amend. XI. This provision "has been interpreted to provide a state with immunity from suit in federal court by . . . its own citizens." *Skelton v. Henry*, 390 F.3d 614, 617 (8th Cir. 2004) (citing *Hans v. Louisiana*, 134 U.S. 1, 10 (1890)).

The *Ex Parte Young* exception to immunity applies to state officials "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution . . . ." *Ex Parte Young*, 209 U.S. 123, 156 (1908). "[T]he *Ex Parte Young* doctrine describes an exception to Eleventh Amendment immunity for a state official where the relief sought is prospective and not compensatory." *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 530 (8th Cir. 2005) (citations omitted). "A federal court may therefore issue an

injunction to prevent state officials from violating the Constitution without running afoul of the Eleventh Amendment." *Id.*; *see also Skelton*, 390 F.3d at 617 ("State immunity under the Eleventh Amendment does not apply to awards for prospective relief . . . .").

"[T]he Supreme Court held that the Eleventh Amendment does not bar a suit against a state official to enjoin enforcement of an allegedly unconstitutional statute, provided that 'such officer [has] some connection with the enforcement of the act.'" *Reprod. Health Servs. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005) (quoting *Ex Parte Young*, 209 U.S. at 157). In *Reproductive Health*, the Eighth Circuit Court of Appeals held that the Missouri Attorney General had "a sufficient connection with the enforcement of [the statute] to make the Attorney General a *potentially* proper party for injunctive relief, in which case he would be within the scope of the *Ex Parte Young* exception to Eleventh Amendment immunity." *Id.* (emphasis in original). "Under Missouri law, the Attorney General is authorized to aid prosecutors when so directed by the Governor, and to sign indictments 'when so directed by the trial court.'" *Id.* (quoting Mo. Rev. Stat. § 27.030). The Eighth Circuit Court of Appeals held that the district court should have dismissed the Attorney General because neither the Governor nor a trial court had directed the Attorney General to enforce the statute in question and, therefore, the plaintiff could not show a threat of irreparable injury. *Id.*

In the case at bar, Attorney General Miller is obliged to "[p]rosecute and defend . . . all actions and proceedings . . . in which the state may be a party or interested, when, in the attorney general's judgment, the interest of the state requires such action, or when requested to do so by the governor, executive council, or general assembly." Iowa Code § 13.2(2). The use of the disjunctive "or" in the Iowa Code makes Attorney General Miller's duties distinct from the duties of the Missouri Attorney General in *Reproductive Health*. Attorney General Miller need not be "directed" to enforce laws by the Governor

or a trial court. Instead, he has been given discretion to determine when to enforce a law. Therefore, the court finds that Attorney General Miller has "some connection with the enforcement" of Senate File 2330. *See Reprod. Health*, 428 F.3d at 1145. Because Attorney General Miller may, in his discretion (or if directed to by Governor Vilsack, the Executive Council or the General Assembly) enforce Senate File 2330 on May 4, 2006, the court finds Attorney General Miller to be an appropriate defendant pursuant to the *Ex Parte Young* doctrine.

Likewise, Commissioner Techau is obligated to "enforce all state laws." *See* Iowa Code § 80.9(2)(a); *see also id.* § 80.1 (creating the Department of Public Safety and the Commissioner); *id.* § 80.2 (providing that the Commissioner is the Chief Executive Officer of the Department of Public Safety). Therefore, because Commissioner Techau must enforce Iowa Code chapter 99G, as amended by Senate File 2330, the court finds that Commissioner Techau is an appropriate defendant under the *Ex Parte Young* exception to Eleventh Amendment immunity.

## IV. FINDINGS OF FACT

### A. The History of Touchplay

This case involves the legality of TouchPlay Machines[1] in Iowa. In 1985, the State created the Lottery. The Iowa Code requires the Lottery to manage and operate lottery games "in a manner that provides continuing entertainment to the public, maximizes revenues, and ensures that the lottery is operated with integrity and dignity and free from political influence." Iowa Code § 99G.2(3). Today, the following lottery games are legal

---

[1] TouchPlay Machines are also known as Monitor Vending Machines or MVMs.

in Iowa: Instant Win, Pull-Tab,[2] Lotto and TouchPlay. (Pl's Ex. 2 at p. 8; Pl's Ex. 13). Lotto games include: Powerball, Hot Lotto, Pick 3, Pick 4 and Iowa's $100,000 Cash Game. (Pl's Ex. 13).

Between 1985 and 2005, nearly $1.9 billion was awarded in prizes and nearly $935 million was raised for the State. (*Id.* at p. 6). The State uses lottery earnings to pay for educational programs, natural resources programs, health and family services and public safety programs. In fiscal year 2005, the Lottery raised over $51 million in revenue for the State. (*Id.*).

In addition to lottery games, the Iowa General Assembly ("the Legislature") has made other forms of gambling legal. The Legislature legalized pari-mutuel wagering in 1983; riverboat gambling and simulcasting at pari-mutuel racetracks in 1989; and slot machines at pari-mutuel racetracks in 1994. *See* Iowa Admin. Code ch. 491; Iowa Code chs. 99D and 99F.

In 2000 and 2001, the State suffered from a revenue shortfall. As a result, the Legislature instructed the Lottery to develop a program which would produce additional revenues for the State. It instructed the Lottery to

> investigate whether the deployment of vending machines with video screens would enhance the lottery's ability to perform its statutory duties and if, in the business judgment of the lottery

---

[2] The terms "pull-tab" and "pull-tab ticket" are defined as follows in the Iowa Code: "[A] game that offers preprinted paper tickets with the play data hidden beneath a protective tab or seal that when opened reveals immediately whether the player has won." Iowa Code § 99G.3(12) (2005). The Iowa Administrative Code defines Pull-Tabs as follows: "'Pull-tab tickets'" are instant lottery tickets that are played by opening tabs to reveal if a prize was won. 'Pull-tab tickets' do not include 'scratch tickets' that are played by removing a rub-off covering from the play area." Iowa Admin. Code r. 531-19.2 (2006).

> commissioner and the lottery board, it would do so, . . . the
> lottery is authorized to establish a plan to implement the
> deployment of pull-tab vending machines with video
> monitors . . . .

2002 Iowa Acts, 2d Extra Sess., Ch. 1003, § 21(3)2. The instructions prompted the Lottery to create the TouchPlay Program.

A TouchPlay Machine is "a vending machine that dispenses or prints and dispenses lottery tickets that have been determined to be winning or losing tickets by a predetermined pool drawing machine prior to the dispensing of the tickets." Iowa Admin. Code r. 531-14.3. Additionally, each TouchPlay Machine has "a video monitor for display of ticket symbols and audio capabilities to aid in play of a game." *Id.* TouchPlay winners are determined just as Pull-Tab winners are determined. That is, TouchPlay games have predetermined outcomes. (Pl's Ex. 6 at p. 3). The TouchPlay tickets are loaded into the machine electronically and the outcome of each ticket is predetermined before a consumer ever begins to operate the TouchPlay Machine. (*Id.*). TouchPlay Machines are different from slot machines because they do not have an internal randomizer. (*Id.*) ("The key difference between the machines is that a slot machine payout is random, as determined by a randomizer within the slot machine, while a [TouchPlay Machine] payout is predetermined as with conventional scratch tickets in finite pools distributed by a central computer."). To the consumer, however, TouchPlay Machines are exceedingly similar to slot machines. Both slot machines and TouchPlay Machines barrage the consumer with flashing lights and attention-grabbing sounds.

Because it did not have the ability to borrow money from the State to place TouchPlay Machines into operation, the Lottery partnered with private businesses that would raise the capital and assume the risk of placing TouchPlay Machines in businesses throughout Iowa. (Pl's Exs. 1 and 2). HCP is such a partner.

In fiscal year 2005, net sales from TouchPlay Machines totaled about 6.4 million. (Pl's Ex. 2). TouchPlay net sales were projected at $381.6 million for fiscal year 2006. (Pl's Ex. 21). Prior to the passage of Senate File 2330, the State was projected to receive approximately $30 million in net revenues and approximately $3.5 million in state income tax for prize monies paid to consumers in fiscal year 2006. (*Id.*).

## B. *The Players*

In May of 2003, TouchPlay Machines were first distributed in bars in the Des Moines and Waterloo/Cedar Falls areas during a six-month testing period. (Pl's Exs. 13 and 21). Statewide TouchPlay sales began in April 2004. (Pl's Ex. 13). As of April 8, 2006, there are 6,432 TouchPlay Machines in the State. (Pl's Ex. 21). Distribution of TouchPlay Machines involves manufacturers, distributors, operators or "MVM Retailers" and "business premise owners." Only four companies manufacture TouchPlay Machines that are in use in the State: (1) Bally Gaming, Inc. of Las Vegas, Nevada; (2) Diamond Games Enterprises, Inc. of Chattsworth, California; (3) Oasis Gaming of Omaha, Nebraska; and (4) Multimedia Games of Austin, Texas. Each manufacturer maintains a central computer which can be accessed by the Lottery.

Four distributors market the TouchPlay Machines for these four manufacturers. The distributors include: (1) Moss Distributing of Des Moines, Iowa; (2) Greater America of Johnston, Iowa; (3) Central Distributing of Omaha, Nebraska; and (4) Redline Vending of New Hampton, Iowa.

There are ninety licensed MVM Retailers who may purchase or lease the TouchPlay Machines, find business locations to place the TouchPlay Machines and maintain the TouchPlay Machines. (Pl's Ex. 21). Of the ninety licensed MVM Retailers, eighty-one have been active at some point in the Touchplay Program. (*Id.*). As of April 8, 2006, seventy-five MVM Retailers are active. (*Id.*).

In addition to the manufacturers, distributors and MVM Retailers, there are 3,839 licensed business premises. (*Id.*). As of April 8, 2006, there are 2,909 active licensed business premises. (*Id.*). The licensed business premises include convenience stores, gas stations, truck stops, grocery stores, drug stores, liquor stores, bars, restaurants, bowling alleys and fraternal organizations. (Pl's Ex. 13). Distribution of TouchPlay Machines throughout Iowa has cost approximately $100 million. (Pl's Ex. 5).

The Lottery does not own any of the TouchPlay Machines. (Pl's Ex. 21). The Lottery performs certain functions in the TouchPlay Program, including the following eight functions:

> (1) certifying TouchPlay Machines and having contracts with the manufacturers;
>
> (2) licensing distributors, MVM Retailers and business premises for the TouchPlay Machines;
>
> (3) testing and approving specific TouchPlay games;
>
> (4) setting criteria for TouchPlay games, including the number of winning plays and the amount of prizes to be paid to players;
>
> (5) collecting financial data from the individual TouchPlay Machines through each manufacturer's central computer;
>
> (6) collecting revenues from all TouchPlay Machines for the State by electronic transfers at a current rate of twenty-four percent of the total revenues from all of the manufacturers upon verification of financial data sent from each manufacturer's central computer; and
>
> (7) paying manufacturers a share of the revenues at the rate of approximately fifteen percent of the revenue from all of the

manufacturers' TouchPlay Machines upon presentation of an invoice and verification of financial data sent from each manufacturer's central computer.

(*Id.*).

### C. Documents Authored by the Lottery

On December 20, 2004, the Lottery issued a two-page Memorandum addressed to "Lottery MVM Retailers" ("the 2004 Memorandum"). (Pl's Ex. 8). The 2004 Memorandum, in part, provides:

> Compensation for all parties shall be based on a percentage of net revenues. Lottery compensation will be:
>
> | | |
> |---|---|
> | CY 2005 | 24% |
> | CY 2006 | 24% |
> | CY 2007 | 27% |
> | CY 2008 | 30% |
> | CY 2009 | 34% |
>
> . . . Net revenue is defined as funds accepted by the MVM less the amount of tickets issued that are payable on the premises and less a percentage of sales used to fund payment of single-play prizes in excess of $600 as set forth in the game's prize structure.

(*Id.*).

On January 26, 2005, the Lottery's Vice President of Sales, Larry L. Loss, sent a five-page letter to "MVM Retailer," along with a packet of information that pertained to becoming a "licensed Iowa Lottery retailer" (collectively referred to as the "January 2005 Packet"). (Pl's Ex. 9). Enclosed in the January 2005 Packet was HCP's non-transferable MVM Retailer license ("HCP's License"), which has a January 10, 2005 issue date. (*Id.*; Def's Ex. D). HCP's License is a one-page certificate and identification card. (Def's Ex. D). Also enclosed in the January 2005 Packet is a seven-page document entitled

"Licensing Terms and Conditions (January 2005)." (Pl's Ex. 9). The seven-page document tracks the language of chapter 531 of the Iowa Administrative Code. It provides that Iowa Code chapter 99G and Iowa Administrative Code chapter 531 are incorporated by reference. (*Id.*).

The January 2005 Packet instructs HCP to begin selling tickets through TouchPlay Machines by October 29, 2005. (*Id.*). The Lottery further instructs HCP on various topics, including: restrictions on TouchPlay logos and advertising, the installation of TouchPlay Machines, the law pertaining to TouchPlay Machines, information about revenue splits and information regarding obtaining and paying for the ticket stock. (*Id.*). The January 2005 Packet informed HCP that the Lottery's percentage of net revenue would be 24% in calendar years 2005 to 2006; 24% in calendar year 2007; 27% in calendar year 2008; 30% in calendar year 2009; and 34% in calendar year 2010. (*Id.*). At the end of the January 26, 2005 letter, Vice President Loss wrote: "We look forward to providing entertaining games for your customers and making your business more profitable." (*Id.*).

On June 2, 2005, Vice President Loss again wrote a letter to "MVM Retailers" ("June 2005 Letter"). (Pl's Ex. 11). In part, the June 2005 Letter provides:

> The Iowa Lottery is making changes to its Retailer Licensing Terms and Conditions related to [TouchPlay Machines]. A copy of the revised Terms and Conditions[3] is enclosed. Amendments were made to Section A, number 23, and Section E, numbers 11 and 12. These revisions will become effective June 16, 2005 . . . .
>
> Due to the changes to the Terms and Conditions, processing of MVM premises operator license applications will be put on hold until June 16.

___

3   The court, hereinafter, refers to these terms and conditions as the "June 2005 Licensing Terms and Conditions."

> The Lottery also is implementing a formal inspection process
> for MVM premises . . . .
>
> Thanks for participating in the TouchPlay program.  We value
> your partnership!

(*Id.*).  The June 2005 Licensing Terms and Conditions is nearly identical to the Licensing Terms and Conditions issued in January 2005.  (Pl's Ex. 20; Def's Ex. F).  It, too, incorporates by reference chapter 99G of the Iowa Code and chapter 531 of the Iowa Administrative Code, and it provides that the statutory and regulatory provisions preempt any conflicting provisions.  (*Id.*).

### D.  HCP's Business

HCP is a licensed MVM Retailer that owns 724 TouchPlay Machines and lawfully operates 572 of them in approximately 187 business locations throughout the State. (Declarations of Rodney Clennon, Timothy Youmans and Marshall Armstrong [hereinafter collectively referred to as "HCP's Declarations"]; Affidavit of Steve King).  HCP spent $4.7 million to purchase and install the TouchPlay Machines, and it spent more than $2.1 million in related expenses—such as paying business premises owners and servicing and maintaining the TouchPlay Machines.  (HCP's Declarations).  It is financially obligated for $3.1 million in debt for the purchase of the TouchPlay Machines.  (*Id.*).

Additionally, HCP entered into approximately 200 contracts ("Location Contracts") with business premise owners.  (*Id.*).  The Location Contracts, in part, provide:

> In consideration for the sum of $10.00, Proprietor hereby
> grants unto HCP the exclusive right for five (5) years to install
> and maintain all [TouchPlay Machines] as may be allowed by
> law or promulgated regulation . . . upon the Proprietor's
> business premises . . . .

(*Id.*). HCP also entered into other contracts related to its business needs. (*Id.*). It employs twenty Iowans. (*Id.*).

HCP began reporting TouchPlay revenue to the Lottery in the week ending March 19, 2005. (Affidavit of Steve King). As of the week ending April 1, 2006, HCP operated 572 machines. (*Id.*). HCP remitted approximately $2.5 million to the Lottery since commencing its TouchPlay business. (HCP's Declarations). After subtracting TouchPlay prizes, HCP's TouchPlay Machines produced $12,186,006 in revenue between March 2005 and the week ending April 1, 2006. (Affidavit of Steve King). Between the week ending March 19, 2005, and the week ending April 1, 2006, HCP realized $3,737,159 in income. (*Id.*). The court is unable to make a finding as to how much money HCP would make before March of 2010 absent the enactment of Senate File 2330. *See Andrus v. Allard*, 444 U.S. 51, 66 (1979) (stating that "[p]rediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform"). If the court were to speculate, it would find that HCP would likely lose approximately $30 million in profits as a result of the ban on TouchPlay Machines.[4]

### E. The Ban

On January 6, 2006, Dr. Stanek appeared before the Administrative Rules Review Committee of the Iowa House of Representatives ("the Committee") to propose new rules pertaining to the placement of TouchPlay Machines. At that meeting, some Representatives expressed concern over the State's reliance on the revenue from TouchPlay

---

[4] This assumes that consumers will continue to use HCP's 572 TouchPlay Machines at the same rate as they currently use them, that HCP will continue the same 50/50 split with its business premise owners and that the Lottery will receive an increasing percentage of the net revenue each year, as set forth herein.

Machines. It was the consensus of the Committee that the Legislature should review the legislative intent regarding the TouchPlay Program.

On January 9, 2006, Governor Vilsack and Lt. Governor Sally Pederson announced the appointment of a six-member TouchPlay Task Force. (Pl's Ex. 6). Members of the Task Force included: the Poweshiek County Attorney, a representative from the Ameristar Casino, a representative from the Riverboat Development Authority, a representative from Moss Distributing, Dr. Stanek and Commissioner Techau. (*Id.*). The Task Force was charged with answering the following three questions:

1.  Is a TouchPlay Machine a slot machine or an Iowa Lottery product?

2.  Are there adequate safeguards to prevent minors, addicted gamblers, and intoxicated persons from playing TouchPlay?

3.  If there are not adequate safeguards, what additional safeguards does the Task Force recommend?

(*Id.*). In a letter to Dr. Stanek dated January 9, 2006, Governor Vilsack requested a sixty-day moratorium on the licensing of new TouchPlay Machines. (Def's Ex. G). The Lottery agreed to impose such a moratorium. (Affidavit of Mary Neubauer).

On March 8, 2006, the Task Force issued its report. (Pl's Ex. 6). The Task Force members reached a consensus regarding the first question. (*Id.*). They determined that TouchPlay Machines are a Lottery product. (*Id.*). As to the second question, the report reads: "A majority of the Task Force agreed that there are not adequate safeguards. All agreed that there is need for improvement, and additional safeguards would be beneficial." (*Id.*). As to the third question, the Task Force recommended several additional safeguards to protect addicted gamblers and minors, but it did not recommend banning the TouchPlay Machines or curtailing the TouchPlay Program. (*Id.*).

In a letter to Dr. Stanek dated March 9, 2006, Governor Vilsack requested that the Lottery extend the 60-day moratorium until the end of the "current legislative session or upon the effective date of any legislation regarding TouchPlay, whichever is later." (Def's Ex. H).

On March 13, 2006, the Iowa Senate passed Senate File 2330 by a margin of forty to ten, and the Senate immediately sent it to the Iowa House of Representatives.[5]  On March 14, 2006, Senate File 2330 passed the Iowa House of Representatives by a margin of eighty to eighteen.  On March 20, 2006, Governor Vilsack signed Senate File 2330 into law.  Section 4 provides, in part:

> Monitor Vending Machines. . . . [A] retailer that has acquired a monitor vending machine prior to the effective date of this Act shall be allowed to offer the machine to the public for only forty-five days following the effective date of this Act.  On or after forty-five days following the effective date of this Act, a retailer shall not make a monitor vending machine available to the public.

(Pl's Ex. 7).  The effective date and time is, therefore, May 3, 2006 at 11:59 p.m.  Due to Senate File 2330, HCP has kept its remaining 152 TouchPlay Machines in storage and out of active use.

## V.  COUNT III – IMPAIRMENT OF CONTRACT

In its Second Amended Complaint, HCP alleges that Defendants violated Article I, Section 10 of the United States Constitution by impairing its right to contract in two respects.  HCP argues that, if Senate File 2330 is applied to it, the ban impairs (1) HCP's

---

[5]  *See* "Total Bill History" of SF 2330, *available at* http://www.legis.state.ia.us/Legislation.html.

contract with the Lottery and (2) HCP's approximately 200 Location Contracts with business premises owners.[6]

The United States Constitution provides: "No state shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10. "Read literally, this constitutional prohibition bans any interference with contracts, but cases interpreting the clause clearly indicate that this prohibition 'is not an absolute one and is not to be read with literal exactness like a mathematical formula.'" *Honeywell, Inc. v. Minn. Life & Health Ins. Guar. Ass'n*, 110 F.3d 547, 551 (8th Cir. 1997) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934)). "Instead, when a litigant contends that a legislative amendment has impermissibly impaired contractual obligations, [the Supreme Court's] inquiry initially focused on whether the change in state law has operated as a substantial impairment of a contractual relationship." *Id*. (internal quotations omitted). "The Contract Clause does not deprive the States of their 'broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or

---

[6] The court rejects any assertion made by HCP that Iowa Code chapter 99G or Iowa Administrative Code chapter 531 give rise to an enforceable contract. "In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." *Honeywell, Inc. v. Minn. Life & Health Ins. Guar. Ass'n*, 110 F.3d 547, 552 (8th Cir. 1997) (quoting *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 17 n.14 (1977)). A clear indication must exist "'that the legislature intends to bind itself contractually,' which is necessary in order to overcome the general presumption 'that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" *Id*. (quoting *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 465-66 (1985)). Here, the Legislature did not intend to bind itself, rather, the Administrative Rules specifically provide that no contractual rights shall vest. *See* Iowa Admin. Code r. 531-14.12 ("The possession of an MVM license . . . is a privilege personal to that person or entity and is not a legal right.").

even destroyed, as a result.'" *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) (quoting *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977)). "A serious alteration of the terms of a contract resulting from state legislation is permissible if, but only if, the legislation is necessary to meet a broad and pressing social or economic need, if the legislation is reasonably adapted to the solution of the problem involved, and if it is not overbroad or over harsh." *White Motor Corp. v. Malone*, 599 F.2d 283, 287 (8th Cir.), *aff'd*, 444 U.S. 911 (1979). The Contract Clause prohibits laws impairing contracts, regardless of whether a state is a party to the contract or the contract is between private parties. *Minn. Gas Co. v. Pub. Serv. Comm'n*, 523 F.2d 581, 585 (8th Cir. 1975) (citing *City of El Paso v. Simmons*, 379 U.S. 497, 506-09 (1965)).

The Eighth Circuit Court of Appeals has set forth a three-part test for determining whether a statute violates the Contract Clause:

> (1) The first inquiry is whether the state law has, in fact, operated as a substantial impairment on pre-existing contractual relationships. If there is no substantial impairment of contractual relationships, the law does not violate the Contract Clause. If, however, the law does constitute a substantial impairment, the second part of the test is addressed:

> (2) The State must have a significant and legitimate public purpose behind the regulation. If there is no significant and legitimate public purpose, the state law is unconstitutional under the Contract Clause. If a significant and legitimate public purpose has been identified, the third part of the test is applied:

> (3) [A court] must determine whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.

19

*Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 850 (8th Cir. 2002) (internal citations and quotations omitted); *see also In re Workers' Compensation Refund W. Nat'l Mut. Ins. Co.*, 46 F.3d 813, 817 (8th Cir. 1995) ("In practical terms, state legislation violates the Contract Clause if: (1) the state law operates as a substantial impairment upon a contractual relationship, and (2) the state cannot demonstrate a significant and legitimate public purpose behind the regulation.").

The court will first analyze HCP's alleged contract with the Lottery and then analyze its alleged Location Contracts utilizing the three-part test.

### A. The Contract Between HCP and the Lottery

At trial, HCP conceded that there was no single, fully integrated written document in this matter between HCP and the Lottery. HCP's counsel stated:

> What I think we have here is an implied, in fact, contract [sic] which is partly written and partly oral. . . . The Court is certainly correct in indicating that there is not a single integrated written document which is the contract between HCP and the [Lottery]. It is the position of the plaintiff, rather, that what we have is the nature of a partnership or a joint venture with the Lottery Authority . . . .

April 12, 2006 Trial Transcript at 8. The court finds that HCP conceded that it has no single, fully integrated written contract with the State. Therefore, the court will not analyze whether HCP's License, by itself, constitutes the contractual relationship allegedly at issue here.

Although a single written contract does not exist, HCP claims that an implied-in-fact contract is established by five documents. Those five documents include the following:

1.    the 2004 Memorandum (Pl's Ex. 8);

2.    the January 2005 Packet (Pl's Ex. 9);

3.    HCP's License (Def's Ex. D);

4.    the June 2005 Letter (Pl's Ex. 9); and

5.    the June 2005 Licensing Terms and Conditions (Def's Ex. F and Pl's Ex. 20).

(collectively referred to as "the Five Contractual Documents"). Defendants respond that there can be no impairment of contract because HCP's License is not a contract and the alleged "partnership" HCP has with the Lottery cannot be classified as an implied-in-fact contract.

**1.    *Whether there is a substantial impairment on a pre-existing contractual relationship?***

To determine whether the first inquiry of the *Janklow* Contract Clause test is met, the court must inquire as to: "'[1] whether there is a contractual relationship, [2] whether a change in law impairs that contractual relationship, and [3] whether the impairment is substantial.'" *Janklow*, 300 F.3d at 850 (quoting *Romein*, 503 U.S. at 186). The court turns to consider these three factors.

**a.    *Whether a contractual relationship exists?***

HCP argues that its contract with the State consists of the Five Contractual Documents. "In Iowa, a contract will be implied where there has been a mutual manifestation of assent by acts and deeds (rather than words) to the same terms of an agreement." *McBride v. City of Sioux City*, 444 N.W.2d 85, 90 (Iowa 1989);[7] *see also*

---

[7] The court finds that there is no dispute that the alleged implied-in-fact contract (continued…)

*Nichols v. City of Evansdale*, 687 N.W.2d 562, 574 (Iowa 2004) ("An implied-in-fact contract requires mutual manifestation of assent."). "The substance of such a contract must be determined from the acts of the parties in light of the subject matter and the surrounding circumstances." *McBride*, 444 N.W.2d at 90. The "traditional rules of contract law" apply to implied-in-fact contracts. *Hunter v. Union State Bank*, 505 N.W.2d 172, 177 (Iowa 1993). Therefore, the doctrines of offer and acceptance, consideration and breach all apply. *Id.*

The Iowa Supreme Court has also recognized "unilateral contracts." *See McBride*, 444 N.W.2d at 90 (discussing unilateral contracts in employment context).[8] "A unilateral contract consists of an offeror making a promise and an offeree rendering some performance as acceptance." *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 282 (Iowa 1995). HCP carries the burden to prove the existence of any unilateral contract. *See Anderson*, 540 N.W.2d at 281.

All contracts, including unilateral contracts, must contain mutual assent. *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 26 (Iowa 1997).

> This assent is usually given through an offer and acceptance. An offer is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding

---

[7](…continued)
and the Location Contracts are governed by Iowa law.

[8] Although the majority of Iowa cases that discuss unilateral contracts are cases in which an at-will employee relies on statements in employee handbooks and claims he or she had a contract for continued employment, the law of unilateral contracts is not limited to contracts for continued employment. *See Kartheiser v. Am. Nat'l Can Co.*, 84 F. Supp. 2d 1008, 1012 (S.D. Iowa 1999) (stating the same and citing E. Farnsworth, *Contracts*, § 312, at 223 (1990), for the proposition that a unilateral contract results when an offeror seeks performance and not a return promise as the desired mode of assent).

that his [or her] assent to that bargain is invited and will conclude it." [The Iowa Supreme Court] look[s] for the existence of an offer objectively, not subjectively.

The test for an offer is whether it induces a reasonable belief in the recipient that he or she can, by accepting, bind the sender. If an offer is not definite, there is no intent to be bound. In other words, when dealing with a unilateral contract, the offeree's performance "must have been induced by the promise made."

*Id.* at 26 (citations omitted). "In addition to the requirement that there be a definite intent to be bound, an offer must also be certain as to its terms and requirements." *Id.*

### i.    Offer

The first question here is whether the compilation of letters and memos by the Lottery constitute a contractual offer. The court finds that the Five Contractual Documents manifest a willingness on the part of the Lottery to enter into a bargain. The Lottery solicited "MVM Retailers," like HCP, and induced a reasonable belief in the MVM Retailers that the Lottery would be bound to perform certain tasks, including: marketing the TouchPlay Machines, monitoring TouchPlay licenses, paying prizes in excess of $600, maintaining the four manufacturers' central computer systems, billing the retailers for weekly TouchPlay sales and inspecting MVM Retailers. The court finds that the Five Contractual Documents induced a reasonable belief in HCP that it could, by accepting the Lottery's terms, bind the Lottery. *See id.* The court finds that the Lottery's offer was definite and that it intended to be bound. *Id.* The Lottery manifested a willingness to enter into a bargain in which it would receive a certain percentage of net revenues from HCP. *Id.*

The court finds that the offer by the Lottery was "certain as to its terms and requirements." *Id.* The court need not set forth each term and requirement involved in

the offer. For present purposes, the court need only discuss the term that is relevant to this dispute, namely, the duration of the contract.

The court finds that the Lottery made an offer to HCP to enter into a contract that could be terminated by either party at any time, i.e., the contract was for an indefinite duration. Contracts of indefinite duration are not unknown under Iowa law. *See, e.g.*, *Smidt v. Porter*, 695 N.W.2d 9, 20 (Iowa 2005) (discussing an employment contract in which either party could terminate at any time). A finding that the contract here was of an indefinite duration is warranted because there are numerous provisions in the Five Contractual Documents which give HCP notice that the Lottery reserved the right to end the contractual relationship at any time. For example, the June 2005 Licensing Terms and Conditions, in part, provide: "A license is valid until it . . . is terminated by a change in circumstances . . . ." (Def's Ex. F and Pl's Ex. 20 at ¶ 3); *see also* Iowa Admin. Code r. 531-14.7 (providing nearly identical language). Likewise, the June 2005 Licensing Terms and Conditions contain a catch-all provision: "A retailer's license may be revoked, suspended, terminated or limited by the Lottery if a retailer fails to comply with any applicable law or administrative rule, these terms and conditions, or instructions given to the retailer." (Def's Ex. F and Pl's Ex. 20 at ¶ 7). Further, HCP could remove its TouchPlay Machines from business premises at any time and terminate its relationship with the Lottery. Nothing in the Five Contractual Documents forbids such action.

HCP claims that the contract was for a five-year period. The court finds that the Five Contractual Documents certainly contain references to payments of net revenues over a period of five years. Unlike the Location Contracts, however, the contractual terms offered by the Lottery do not include a five-year commitment or any renewal clauses. Therefore, the court finds that the offer by the Lottery was for an indefinite period which gave either party the ability to terminate the relationship at will.

24

### ii.    Acceptance

If an offer is found, the court must examine whether there is acceptance. *Magnusson Agency*, 560 N.W.2d at 26.   "An offer that invites an acceptance by performance is deemed accepted by such performance unless there is a manifestation of intention to the contrary." *Id.*  The court finds that HCP performed between about January 2005 and April 12, 2006, under the terms and conditions established by the Lottery.  HCP performed, in part, as follows:  it obtained HCP's License in January 2005; it invested $4.7 million in TouchPlay Machines; it entered into Location Contracts with business premise owners; it entered into employment contracts; it placed TouchPlay Machines in various business premises; it began operating the TouchPlay Machines in March 2005 in accordance with the parameters established by the statutes, the rules, and the Lottery; and it maintained and serviced the active TouchPlay Machines.  Here there was mutual assent, which is best evidenced by the ongoing nature of the relationship between HCP and the Lottery and the fact that the Lottery accepted approximately $2.5 million from HCP since HCP began operating TouchPlay Machines in March 2005.  The court, therefore, finds HCP accepted the Lottery's offer by performing.

### iii.    Consideration

In addition to offer and acceptance, "[a]nother essential element of any binding contract is consideration." *Id.*  The party challenging the existence of a contract has the burden to prove a lack of consideration. *Kristerin Dev. Co. v. Granson Inv.*, 394 N.W.2d 325, 331 (Iowa 1986).  Lack of consideration is generally a defense to contract formation. *Hubbard Milling Co. v. Citizens State Bank*, 385 N.W.2d 255, 258 (Iowa 1986). Defendants do not challenge the existence of consideration.

Even if Defendants raised a consideration challenge, the court would find consideration existed.  The court must only find that there was either a benefit to the

promisor or a detriment to the promisee. *Id.* Moreover, "'[a]ny performance which is bargained for is consideration.'" *Magnusson Agency*, 560 N.W.3d at 27 (citing Restatement (Second) of Contracts § 72 (1981)). "A performance is bargained for if it is sought by the promisor in exchange for his or her promise and is given by the promisee in exchange for that promise." *Id.* (citing Restatement (Second) of Contracts § 71(2)).

The court finds that there is consideration in the instant case. Put quite simply, the Lottery agreed to provide HCP with "entertaining games for [its] customers" in order to make HCP's business "more profitable" (Pl's Ex. 9 at p.5), and HCP, in turn, agreed to expend personal and financial resources to maintain a TouchPlay business that remitted a percentage of net revenues to the Lottery.

### *iv.    Conclusion*

Because the Lottery extended an offer which included definite terms and requirements, HCP accepted that offer and consideration exists, the court finds the Lottery and HCP entered into a binding implied-in-fact contract.[9]

---

[9] Although the court determined a contract exists for purposes of its Contract Clause analysis, that determination does not establish a breach of contract claim. As noted here, the elements of proof in a Contract Clause violation claim are distinct. The complaining party in a breach of contract action must prove the following elements:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Med. Assocs. Health Plan, Inc. v. CIGNA Corp.*, 393 F. Supp. 2d 722, 726 (N.D. Iowa 2005) (citing *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224-25 (Iowa 1998)).

### b. Whether the change in the law impairs that contractual relationship?

In assessing the second component of the inquiry, that is, whether there is a substantial impairment of a contractual relationship, the court "must first identify what contractual rights, if any, have been impaired." *Janklow*, 300 F.3d at 851. The court finds that the terms of the parties' implied-in-fact contract have not been impaired. The court finds that Iowa Administrative Rules 531-14.1 through 531-14.20 are terms of this implied-in-fact contract. *See* Def's Ex. F and Pl's Ex. 20. Rule 531-14.7 provides that HCP's License could be terminated "by a change of circumstances." Therefore, by its very terms, the Lottery has the right to terminate the implied-in-fact contract at any time. The court finds that, if the Lottery were to unplug the manufacturer's central computers on May 3, 2006 at 11:59 p.m., it would be merely exercising its rights under the contract, that is, under Iowa Administration Rule 531-14.7 and paragraph three of the June 2005 Licensing Terms and Conditions. It would be invalidating HCP's License based on a change of circumstances. Because HCP's License is part and parcel of the implied-in-fact contract, the Lottery will effectively terminate the contract.

Therefore, the court finds that the implied-in-fact contract between HCP and the Lottery will terminate due to its own terms on May 3, 2006 at 11:59 p.m. If the parties had contracted for a finite term of years, the court's conclusion with respect to whether the law impairs the parties' contractual relationship or rights could not stand. However, there is no impairment of contract because the parties bargained for the right to terminate the contract at any time if circumstances changed.

### c.    Whether the contractual impairment is substantial?[10]

Step three of the first inquiry requires the court to determine whether the impairment of the parties' pre-existing contractual relationship is substantial. *Janklow*, 300 F.3d at 853-54. To determine whether the parties' contractual relationship is substantially impaired, the court must look to the parties' reasonable expectations. *See In re Workers' Compensation Refund*, 46 F.3d at 819 (considering "the extent to which the [parties'] reasonable contract expectations have been disrupted"). The Supreme Court has placed great weight on contractual expectations because "[c]ontracts enable individuals to order their personal and business affairs according to their particular needs and interests[, and,] [o]nce arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Allied Structural Steel*, 438 U.S. at 245.

"Reasonable expectations are affected by the regulated nature of an industry in which a party is contracting." *In re Workers' Compensation Refund*, 46 F.3d at 819 (citing *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)). "Heavy regulation of an industry may reduce reasonable expectations." *Id.* at 820. The Eighth Circuit Court of Appeals has instructed that "the more severe the impairment, the closer scrutiny the statute will receive." *Janklow*, 300 F.3d at 854. "Total destruction of contractual expectations is not necessary for a finding of substantial impairment . . . ." *U.S. Trust Co.*, 431 U.S. at 26-27. The court should, first, set forth the nature of the impairment and, second, "consider how previous regulation affects the extent of the impairment." *Id.*

---

[10] Despite finding no impairment of the contractual relationship under the second step of the first inquiry, the court deems it appropriate to analyze step three of the first inquiry.

### i.     Nature of the impairment

"Total destruction of a contract is a substantial impairment." *Honeywell*, 110 F.3d at 558. Senate File 2330 effectively eliminates the entirety of the contractual relationship between HCP and the Lottery. It destroys the purpose of the contract because it makes it unlawful for HCP and the Lottery to provide TouchPlay Machines to the consumer for profit. Senate File 2330 was enacted to impair the use of TouchPlay Machines. *See id.* ("[T]he impairment was not merely incidental to another legislative purpose; the statute was enacted to impair."). Therefore, the court finds that the nature of the impairment is a total impairment.

### ii.     Previous regulation

"In general, when an industry is heavily regulated, parties are considered to have less reasonable expectation that legislation will not alter their contractual arrangements." *Honeywell*, 110 F.3d at 558 (citing *Energy Reserves*, 459 U.S. at 411). The court must determine whether the impairment resulting from the ban was foreseeable. *See Janklow*, 300 F.3d at 857 (explaining that the second step in analyzing the nature of the legislation's impairment on the pre-existing contracts "is to ascertain whether previous regulation affects the nature of the impairment, i.e., whether the impairment was foreseeable"). "Parties' expectations of future regulation are important in determining whether contractual rights are substantially impaired . . . ." *Id.*

The court can think of few businesses that are as regulated, or more regulated, than gambling and gaming. These industries are heavily regulated pursuant to a comprehensive statutory and regulatory scheme. *See, e.g.* Iowa Code chs. 99, 99A, 99B, 99C, 99D, 99F and 99G; Iowa Admin. Code chs. 491 and 531; *see also Corner Pocket of Sioux Falls, Inc. v. Video Lottery Techs., Inc.*, 123 F.3d 1107, 1110 n.2 (8th Cir. 1997) (noting the "heavily regulated nature" of the video lottery machine business).

Given the general nature of lotteries and the Iowa statutes and regulations, HCP was duly warned that its investments in the TouchPlay Machines was risky in the long term. HCP's expectations should have been guided by rule 531-14.7 of the Iowa Administrative Code which, in part, provides that an MVM Retailer license is valid "until it expires, *is terminated by a change of circumstances*, is surrendered by the licensee, or is revoked by the lottery." Iowa Admin. Code. r. 531-14.7 (emphasis added). The Iowa Code also contains a provision which states that a "lottery retail license issued by [the Lottery] pursuant to [Iowa Code chapter 99G] may be canceled, suspended, revoked, or terminated by [the Lottery] *for reasons including, but not limited to,* any of the following: . . ." Iowa Code § 99G.27(1) (emphasis added). Moreover, the highly regulated nature of the business is apparent in the material sent from the Lottery to HCP and other MVM Retailers. For example, the June 2005 Licensing Terms and Conditions provide:

> *The provisions of Iowa Code chapter 99G, 531 Iowa Administrative Code, and any other applicable statutory or regulatory provisions are herein incorporated by reference. If a provision in this document conflicts with an applicable statutory or regulatory provision, the statutory or regulatory provision preempts the conflicting provision in this document. All retailers should familiarize themselves with applicable statutes and regulations.*

(Def's Ex. F and Pl's Ex. 20 (emphasis in original)). The regulations provide that the MVM license is a "privilege personal to" the license-holder and not a vested right. Iowa Admin. Code r. 531-14.12. Paragraph 2 of the June 2005 Licensing Terms and Conditions provide: "These terms and conditions may be unilaterally amended by the Lottery by providing the retailer with 14 days written notice of amendment." (Def's Ex. F and Pl's Ex. 20 at ¶ 2).

The court finds that the implied-in-fact contract between HCP and the Lottery was highly regulated prior to the passage of Senate File 2330.  Therefore, it should have been foreseeable to the parties that new statutory or regulatory provisions could be passed regarding TouchPlay Machines.  Iowa Administrative Rule 531.14.7, which provides that the MVM licenses could be terminated based on a "change of circumstances," certainly put HCP on notice that the law could change.  The court rejects HCP's argument that the ban was unforeseeable.[11]

Over a century ago, the Supreme Court rejected a constitutional impairment of contract claim when the State of Mississippi contracted to create a lottery and then passed laws making the lottery illegal a few years later.  *See generally Stone v. Mississippi*, 101 U.S. 814 (1879).  In that case, the Supreme Court spoke about the regulated nature of the lottery industry:

> Certainly the right to suppress [the lotteries] is governmental, to be exercised at all times by those in power, at their discretion.  Any one, therefore, who accepts a lottery charter does so with the implied understanding that the people, in their sovereign capacity, and through their properly constituted agencies, may resume it at any time when the public good shall require, whether it be paid for or not.  All that one can get by such a charter is a suspension of certain governmental rights in his favor, subject to withdrawal at will.  He has in legal effect nothing more than a license to enjoy the privilege on the terms named for the specified time, unless it be sooner abrogated by the sovereign power of the State.  It is a permit,

---

[11]  The court notes that, with respect to Marshall Armstrong, Rodney Clennon and Timothy Youmans, the owners of HCP, it appears their unforeseeability argument is substantially weakened by their apparent involvement in South Carolina's legislative ban on video poker machines in 2000.  *See Armstrong v. Collins*, 621 S.E.2d 368, 372 (S.C. Ct. App. 2005), *reh'g denied*, (Nov. 17, 2005).

> good as against existing laws, but subject to future legislative
> and constitutional control or withdrawal.

*Id.* at 821.

The court concludes that, even if it had found there was an impairment in step two, HCP's claim of constitutional contract impairment would not survive step three. HCP's claim fails the third step of the first inquiry of the Contract Clause impairment test because the impairment was foreseeable to the parties, that is, it was not substantial.

### 2. Conclusion

In summary, the first inquiry of the Contract Clause test is answered in the negative. That is: Senate File 2330 does not substantially impair the pre-existing implied-in-fact contract between HCP and the Lottery. Given this conclusion, the court need not consider whether the public purpose is significant and legitimate or whether the adjustment of the rights and responsibilities is based upon reasonable conditions. *See Janklow*, 300 F.3d at 850. Accordingly, with respect to the implied-in-fact contract between HCP and the Lottery, the court concludes that Senate File 2330 does not violate the Contract Clause of the United States Constitution.

### B. The Location Contracts

HCP also contends in its brief that, because HCP's contract with the State is "completely destroyed," HCP's "contractual relationships with the locations where its machines are operated" is "simultaneously devastated." (docket no. 4 at p. 16). It further argued at trial that its contracts with "retail establishments" will be impaired by Senate File 2330.

The court must first analyze whether there is a substantial impairment of a pre-existing contractual relationship and ask whether a contractual relationship exists. The court finds HCP has approximately 200 contractual relationships with various business premises owners through its Location Contracts.[12]

Next, the court must determine whether the change in the law impairs those contractual relationships. The court finds that Senate Bill 2330 does not impair the contractual relationships HCP has with several business premises owners because, again, there is a clause in the Location Contracts which allows for termination due to a legislative ban. The Location Contracts, in part, provide:

> In consideration for the sum of $10.00, Proprietor hereby grants unto HCP the exclusive right for five (5) years to install and maintain all [TouchPlay Machines] *as may be allowed by law or promulgated regulation* . . . upon the Proprietor's business premises . . . .

(emphasis added). The court finds that the phrase "as may be allowed by law or promulgated regulation" allows for termination of the contract in a situation like the one presented by Senate File 2330. Because the Location Contracts allow for an "out" when the law no longer allows TouchPlay Machines to be offered to the public, the court cannot find that the State impaired the Location Contracts by passing Senate File 2330. The Location Contracts are terminated by their own terms, which HCP and various business owners—not HCP and the Lottery—set or established. Because the court finds there is no impairment of the Location Contracts, it will not determine the third step of the substantial

---

[12] Although HCP has only provided a sample of these agreements (HCP's Declarations at ¶ 9 and Ex. 1), the court assumes each "Machine Agreement" is appropriately signed, dated and witnessed.

Additionally, for the same reasons as stated above in footnote 9, the court's analysis does not establish a breach of contract claim.

impairment inquiry, nor will it consider whether the public purpose is significant and legitimate. *See Janklow*, 300 F.3d at 850 ("If there is no substantial impairment of contractual relationship, the law does not violate the Contract Clause.").

The court finds that Senate File 2330 does not violate the Contract Clause as applied to HCP's Location Contracts.

## VI.  COUNT I – THE TAKINGS CLAUSE

In the Second Amended Complaint, HCP makes an as-applied challenge to Senate File 2330 under the Takings Clause.[13] Defendants deny that HCP has a property interest

---

[13] Neither party alleges that HCP's Takings Clause claim is not ripe. Nonetheless, before the court can consider the merits of the claim, the claim must be ripe. *See Thomas v. Basham*, 931 F.2d 521, 523 (8th Cir. 1991) ("In fact, jurisdiction issues will be raised sua sponte by a federal court when there is an indication that jurisdiction is lacking, even if the parties concede the issue."). The Eighth Circuit Court of Appeals stated:

> Although a regulatory taking may be challenged in federal court in an action under 42 U.S.C. § 1983, the claim must be ripe before the federal court may consider it. The issue of ripeness, which has both Article III and prudential components, is one of subject matter jurisdiction. *See McKenzie v. City of White Hall*, 112 F.3d 313, 316-17 (8th Cir. 1997). . . .
>
> A Takings Clause claim must be ripe in two respects. First, the issue of whether there has been or will be a taking must be ripe for federal court review. As the Supreme Court expressed it, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, [473 U.S. 172, 186 (1985)]. Second, because the Constitution only prohibits

(continued...)

protected by the Takings Clause and deny that Senate File 2330 constitutes a taking.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause is made applicable to the states through the Fourteenth Amendment. *See Lingle v. Chevron USA Inc.*, 544 U.S. 528, ___, 125 S. Ct. 2074, 2080 (2005) (citing *Chi., Burlington & Quincy R.R. v. Chicago*, 166 U.S. 226 (1897)).

> While [the Supreme Court] has recognized that the "Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Armstrong v. United States*, [364 U.S. 40, 49 (1960)], [the Supreme Court], quite simply, has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain

---

[13](...continued)

> takings without just compensation, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Williamson County*, [473 U.S. at 195].

*Dakota, Minn. & E. R.R. Corp. v. South Dakota*, 362 F.3d 512, 520 (8th Cir. 2004); *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494 (1987) ("The posture of the case is critical because [the Supreme Court has] recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation."). HCP's claim pursuant to the Takings Clause is ripe because the State has made a final decision to ban TouchPlay Machines and has not established a procedure allowing those affected by the ban to seek compensation.

> disproportionately concentrated on a few persons. See *Goldbatt v. Hempstead*, [369 U.S. 590, 594 (1962)].

*Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 123-24 (1978). "'The inquiry into whether a taking has occurred is essentially an "ad hoc, factual inquiry."'" *Glosemeyer v. Mo.-Kan.-Tex. R.R.*, 879 F.2d 316, 324 n.8 (8th Cir. 1989) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984)).

## A. *Property Rights*

To bring a claim under the Takings Clause, a claimant "must identify a property interest cognizable under the Fifth Amendment . . . ." *Tex. State Bank v. United States*, 423 F.3d 1370, 1378 (Fed. Cir. 2005); *accord C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 200 (D.C. Cir. 2002); *Parella v. Ret. Bd. of R.I. Employees' Ret. Sys.*, 173 F.3d 46, 58 (1st Cir. 1999). In *Eastern Enterprises v. Apfel*, 529 U.S. 498 (1998), a majority of the Supreme Court held that a claimant must have a specific property interest to be within the purview of the Takings Clause. *E. Enters.*, 524 U.S. at 541 (Kennedy, J., concurring in the judgment and dissenting in part) ("Until today, however, one constant limitation has been that in all of the cases where the regulatory taking analysis has been employed, a specific property right or interest has been at stake."); *id.* at 554 (Breyer, J., dissenting) ("The 'private property' upon which the Clause traditionally has focused is a specific interest in physical or intellectual property.").

"Property interests, of course, are not created by the Constitution." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Roth*, 408 U.S. at 577).

HCP alleges that banning TouchPlay Machines will violate the Taking Clause by (1) taking its TouchPlay Machines, (2) destroying its business and (3) taking its contracts. HCP never alleges that the State will physically take its TouchPlay Machines nor alleges that, after May 3, 2006, it will not be in possession of its TouchPlay Machines. Additionally, HCP never alleges that the State will condemn or commandeer its business. The court will consider each of HCP's alleged property interests in turn.

### 1. *Machines*

HCP alleges that it has a property interest in its TouchPlay Machines. Tangible property is property within the purview of the Takings Clause. *Allard*, 444 U.S. at 66; *see also Ruckelshaus*, 467 U.S. at 1002 (holding that a trade secret was property, in part, because it resembled tangible forms of property). The court finds that HCP has a property interest in its TouchPlay Machines. *See Allard*, 444 U.S. at 66.

### 2. *Business*

HCP alleges that it has a property interest in both its TouchPlay business and in continuing its TouchPlay business. Defendants acknowledge that HCP has some property interest in its business, however, they deny that HCP has a property interest in continuing its business.

#### a. *Business itself*

A business is property within the purview of the Takings Clause. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5 (1949) (holding that the Takings Clause required the government to compensate the owners of a condemned laundry business in the amount of its market value during the condemnation); *see also United States v. Pewee Coal* Co., 341 U.S. 114, 115-17 (1951) (holding that taking possession of a mine constituted a taking); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378-79 (1945) (holding that occupying a portion of a warehouse constituted a taking). Property interests in businesses, however,

are not the same as other property interests. The Supreme Court stated:

> [L]oss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests.

*Allard*, 444 U.S. at 66; *cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (concluding that a permanent physical occupation of property is the most serious taking). Accordingly, like other businesses, the court finds that HCP has some property interest in its business.

### b.  *Continuing to operate the business*

HCP alleges that HCP's License, Iowa Code chapter 99G and Iowa Administrative Code chapter 531-14 grant it a property interest in continuing to operate its TouchPlay business. HCP alleges that Senate File 2330 takes this property interest by banning TouchPlay Machines. The right to operate TouchPlay Machines is not inherent in the ownership of the machines or to being in the TouchPlay business. Therefore, the property interest in continuing to operate its TouchPlay business must arise from something other than owning TouchPlay Machines or being in the TouchPlay business. *See, e.g.*, *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1381 (Fed. Cir. 2004) (concluding that the right to use equipment is not inherent in ownership of the equipment); *cf. Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216-17 (Fed. Cir. 1993) (stating that, in a regulated industry, the expectation of selling in commerce was not inherent in ownership).

With respect to HCP's License, "courts have held that no property rights are created in permits and licenses." *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002)

(citing *United States v. Fuller*, 409 U.S. 488, 493 (1973) and *Alves v. United States*, 133 F.3d 1454, 1457 (Fed. Cir. 1998)).  Here, HCP's License grants to it the status of a licensed MVM retailer, however, it neither grants property rights nor represents that HCP can be a licensed MVM Retailer of TouchPlay Machines until 2010.  *See* Iowa Admin. Code r. 531-14.12 (providing that an "MVM license is not a vested right").

Furthermore, HCP's License lacks the indicia of a property interest.  *See, e.g.*, *Am. Pelagic*, 379 F.3d at 1374 (determining whether a property interest exists for purposes of the Takings Clause by examining the rights associated with the interest); *accord Conti*, 291 F.3d at 1341-42.  Property rights typically include the right to sell, assign or transfer the property.  *United States v. Craft*, 535 U.S. 274, 284 (2002) (stating that the right to alienate property is "a right that is often in the bundle of property rights"); *Loretto*, 458 U.S. at 435 ("Property rights in a physical thing have been described as the rights 'to possess, use and dispose of it.'" (quoting *Gen. Motors*, 323 U.S. at 378)).  HCP's License cannot be sold, assigned or transferred; Iowa Administrative Code rule 531-14.6, in relevant part, provides: "MVM licenses may not be transferred to any other person or entity . . . ."  Iowa Admin. Code r. 531-14.6.  Moreover, Iowa Administrative Code rule 531-14.12, in relevant part, provides:  "The possession of an MVM license issued by the lottery to any person or entity to act as an MVM retailer . . . is a privilege personal to that person or entity and is not a legal right."  *Id.* r. 531-14.12.  The enforceable rights guaranteed by HCP's License lack the typical indicia of a property interest.

With respect to Iowa Code chapter 99G and Iowa Administrative Code chapter 531-14, a property interest protected by the Takings Clause cannot arise when the Legislature has "retained authority to amend in the exercise of its power to provide for the general welfare."  *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986); *accord Minnesota v. Apfel*, 151 F.3d 742, 746-47 (8th Cir. 1998).  Here,

the State expressly reserved the power to terminate HCP's License. *See* Iowa Code § 99G.27(1); Iowa Admin. Code r. 531-14.7. Additionally, a property interest cannot arise when the ability to engage in the activity is entirely subject to the exercise of regulatory power. *Mitchell Arms*, 7 F.3d at 217. Here, the State has regulatory power over HCP and TouchPlay Machines. *See* Iowa Code ch. 99G; Iowa Admin. Code ch. 531-14. Therefore, Iowa Code chapter 99G and Iowa Administrative Code chapter 531-14 do not grant HCP a property interest in continuing its business.

### *3.*     *Contracts*

HCP alleges that it has a property interest in its implied-in-fact contract with the Lottery and in its Locations Contracts with the various business premise owners. "Contracts may create rights of property . . . ." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986); *see, e.g.*, *Omnia Commercial Co. v. United States*, 261 U.S. 502, 508 (1923) (holding that a contract for the purchase of steel constituted property under the Takings Clause). In *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41 (1986), the Supreme Court considered whether repealing a social security system termination provision, which provided that the State of California could withdraw from the social security system, constituted a taking. The Supreme Court noted that Congress had retained the right to alter, amend or repeal the social security system and the termination provision was neither a debt of the United States nor an obligation to provide benefits. *Bowen*, 477 U.S. at 55. The Supreme Court concluded that, because Congress had retained the right to amend, the termination provision did not constitute a property interest. *Id*. Here, the Lottery retained the right to amend HCP's License and exercised this right by promulgating Senate File 2330. Furthermore, HCP's Location Contracts allow for termination of the contract due to a change in law or regulation. Accordingly, HCP's implied-in-fact contract with the Lottery and its Location Contracts

with the business premise owners do not constitute a property interest for purposes of the Takings Clause.

### 4. Conclusion

In sum, the court finds that, for purposes of the Takings Clause, HCP has a property interest in its TouchPlay Machines and some property interest in its business, but HCP does not have a property interest in continuing its TouchPlay business or its contracts.

## B. Taking

"[N]ot every destruction or injury to property by government action has been held to be a 'taking' in the constitutional sense." *Armstrong*, 364 U.S. at 48. "Diminution of property value alone does not establish a taking." *Outdoor Graphics, Inc. v. City of Burlington*, 103 F.3d 690, 695 (8th Cir. 1996). "In Justice Holmes' storied but cryptic formulation, 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.'" *Lingle*, 544 U.S. at ___, 125 S. Ct. at 2081 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). "The rub, of course, has been—and remains—how to discern how far is 'too far.'" *Id.*

"Taking jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 327 (2002) (internal quotation marks omitted) (quoting *Penn Cent.*, 438 U.S. at 130-31). "At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Allard*, 444 U.S. at 65-66.

## 1.    *Per se takings*

"Two categories of regulatory takings do not require case-specific inquiry into the public interest advanced in support of the restraint." *Outdoor Graphics*, 103 F.3d at 693-94 (citing *Lucas v. S.C. Coastal Council*, 505 U.S 1003, 1014 (1992)). "First, where government requires an owner to suffer permanent physical invasion of her property—however minor—it must provide just compensation." *Lingle*, 544 U.S. at ___, 125 S. Ct. at 2081 (citing *Loretto*, 458 U.S. at 419); *accord Outdoor Graphics*, 103 F.3d at 694 ("The first category of these 'per se takings' includes regulations that involve a physical invasion of the property."). "A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Lingle*, 544 U.S. at ___, 125 S. Ct. at 2081 (citing *Lucas*, 505 U.S. at 1019); *accord Outdoor Graphics*, 103 F.3d at 695.

### a.    *Permanent physical invasion*

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle*, 544 U.S. at ___, 125 S. Ct. at 2080. "[A permanent physical occupation of another's property] is perhaps the most serious form of invasion of an owner's property rights." *Loretto*, 458 U.S. at 435. "To borrow a metaphor, the government does not simply take a single 'strand' from the 'bundle' of property rights; it chops through the bundle, taking a slice of every strand." *Id*. (internal citation omitted). Here, Senate File 2330 neither appropriates the TouchPlay Machines nor requires HCP to surrender the TouchPlay Machines; after the ban, HCP will still own 724 TouchPlay Machines. Similarly, Senate File 2330 neither requires that HCP cease operating as a business nor condemns HCP's business. The court finds that Senate File 2330 will not physically invade HCP's property.

### b.      All economically beneficial use

HCP alleges that banning TouchPlay Machines will deprive HCP of its economically beneficial use of TouchPlay Machines and this is a violation of the Takings Clause under *Lucas v. South Carolina Coastal Council*, 505 U.S. at 1027.  In *Lucas*, the Supreme Court stated:  "Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with."  *Id*.

HCP argues that the court should apply the *Lucas* rule outside of the context of a deprivation of real property.  In *Lucas*, the Supreme Court stated:

> It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power."  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. at 413.  And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale).

*Lucas*, 505 U.S. at 1027-28.  Moreover, the Court has stated the *Lucas* rule "was limited to 'the extraordinary circumstances when *no* productive or economically beneficial use of land is permitted.'"  *Tahoe-Sierra Pres. Council*, 535 U.S. at 330 (quoting *Lucas*, 505 U.S. at 1017).  Accordingly, the *Lucas* holding does not apply outside the context of deprivations of real property.  Therefore, HCP cannot bring a claim under the *Lucas* rule for a taking of its TouchPlay Machines or its business.

Alternatively, even if the *Lucas* holding applies outside the context of deprivations of real property, HCP has not shown that banning TouchPlay Machines would be a complete deprivation of property. "In the *Lucas* context, of course, the complete elimination of a property's value is the determinative factor." *Lingle*, 544 U.S. at ___, 125 S. Ct. at 2082 (citing *Lucas*, 505 U.S. at 1017); *see also Lucas*, 505 U.S. at 1019 n.8 (noting that a ninety-five percent diminution in value does not constitute a taking). At trial, HCP argued both that TouchPlay Machines only worked by connecting to the TouchPlay central computer system and TouchPlay Machines cannot be moved to another state. In other words, HCP argued that Senate File 2330 deprives HCP of all economically beneficial use of its property. Even after the promulgation of the law, however, TouchPlay Machines will still have value because HCP could sell TouchPlay Machines (e.g. salvage value) or reconfigure the TouchPlay Machines for a different use. *See, e.g.*, *Conti*, 291 F.3d at 1343 (finding that a fishing vessel and gear still had value even after a ban on fishing went into effect). Even though the ban forbids the most profitable use of TouchPlay Machines, banning of the most profitable use of property does not constitute a taking. *Cf. Allard*, 444 U.S. at 66 (holding that, although regulations precluded the "most profitable use" of tangible property, they did not constitute a violation of the Takings Clause when claimants could still derive some economic benefits from the property). Therefore, the court finds that HCP has not proven that Senate File 2330 will result in the complete elimination of the value of its property.

### 2.   Penn Central *analysis*

"Outside these two relatively narrow categories[,] . . . regulatory takings challenges are governed by the standards set forth in *Penn Central Transportation v. New York City*, [438 U.S. 104 (1978)]." *Lingle*, 544 U.S. at ___, 125 S. Ct. at 2081. In *Penn Central*, the Supreme Court stated:

> In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Penn Cent.*, 438 U.S. at 124 (internal citations omitted). The court will consider each factor in turn.

### a.       *Economic impact*

HCP argues that Senate File 2330 will result in losing its business and declaring bankruptcy. The economic impact inquiry "must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." *Keystone*, 480 U.S. at 495. "[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at ___, 125 S. Ct. at 2082. Here, HCP has about $4.7 million invested in its business and will lose a significant portion of this investment if Senate File 2330 goes into effect.

HCP also argues that Senate File 2330 will interfere with its investment-backed expectations, specifically, that it legitimately expected to earn profits over the next five years. The economic impact inquiry also focuses on the regulation's interference with reasonable investment-backed expectations. *Keystone*, 480 U.S. at 495. "A 'reasonable

investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus*, 467 U.S. at 1005 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)). Any reasonable investment-backed expectation must have incorporated the language of HCP's License, Iowa Code chapter 99G and Iowa Administrative Code chapter 531-14. *See id.*; *Outdoor Graphics*, 103 F.3d at 694. Iowa Code section 99G.27(1) and Iowa Administrative Code rule 531-14.7 provide that the State can terminate HCP's License at any time. Additionally, HCP is in the gaming business, a heavily regulated industry. *See, e.g.*, Iowa Code ch. 99; Iowa Admin. Code chs. 491 and 531; *Stone*, 101 U.S. at 821. "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Connolly*, 475 U.S. at 227. By conducting business in a heavily regulated industry, HCP has no reasonable investment-backed expectation that it would be free from regulation. *See, e.g.*, *Cienega Gardens v. United States*, 331 F.3d 1319, 1336 (Fed. Cir. 2003); *Mitchell*, 7 F.3d at 217.

This factor weighs neither in favor of nor against a finding that Senate File 2330 will constitute a taking.

### b. *The character of the governmental action*

Physical intrusions on property interests are more serious than regulations on the use of property. *Loretto*, 458 U.S. at 427. The Supreme Court stated:

> The Court's hesitance to find a taking when the State merely restrains uses of property that are tantamount to public nuisances is consistent with the notion of "reciprocity of advantage" that Justice Holmes referred to in *Pennsylvania Coal*. Under our system of government, one of the State's primary ways of preserving the public weal is restricting the uses individuals can make of their property. While each of us is burdened somewhat by such restrictions, we, in turn, benefit

greatly from the restrictions that are placed on others. These restrictions are "properly treated as part of the burden of common citizenship." Long ago it was recognized that "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community," and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it.

*Keystone*, 480 U.S. at 491 (internal citations and footnotes omitted). Senate File 2330 will only prevent a specific use of TouchPlay Machines. Using property is only a single stick in the bundle of property rights. *See id.* After Senate File 2330 goes into effect, HCP still has the right to possess, lease and sell its TouchPlay Machines. In similar situations, the Supreme Court held: "Regulations that bar trade in certain goods have been upheld against claims of unconstitutional taking." *Allard*, 444 U.S. at 67. Moreover, the Supreme Court stated, "'there was no appropriation of private property, but merely a lessening of value due to a permissible restriction imposed upon its use.'" *Id.* (quoting *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 303 (1920)). Here, even though Senate File 2330 may be commercially crippling, a restriction on the use of TouchPlay Machines does not constitute a taking. *See id.* at 328 n.24 (explaining that a ban on nonintoxicating beverages, even though commercially crippling, did not constitute a taking because the beverage owner could export the product or sell it domestically for purposes other than consumption).

Even though HCP and other manufacturers, distributors, MVM Retailers and business premise owners must bear the cost of the ban on TouchPlay Machines, this "is a burden borne to secure 'the advantage of living and doing business in a civilized community.'" *See Allard*, 444 U.S. at 67 (quoting *Mahon*, 260 U.S. at 422 (Brandeis, J., dissenting)). HCP assumed the business risk when it partnered with the Lottery. As between the public and the manufacturers, distributors, MVM Retailers and business

premise owners, the cost of banning TouchPlay Machines must not be borne by the public.[14]

## VII. COUNTS II & IV – FOURTEENTH AMENDMENT

HCP alleges that banning TouchPlay Machines will violate the Fourteenth Amendment of the Constitution. The Fourteenth Amendment, in relevant part, provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. HCP alleges that Senate File 2330 will violate the Equal Protection Clause and the Due Process Clause.[15]

---

[14] If HCP's implied-in-fact contract with the Lottery and its Location Contracts with the business premise owners constitute property interests, the court still would conclude no taking will occur. Because the implied-in-fact contract between HCP and the Lottery will terminate by its own terms on May 3, 2006 at 11:59 p.m., the contract will no longer exist and, therefore, cannot be "taken." Similarly, because its Location Contracts allow for termination of the contracts due to a change in the law or regulation, no "taking" can occur.

Additionally, "the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." *Connolly*, 475 U.S. at 224 (citing *Bowles v. Willingham*, 321 U.S. 503, 517 (1944) and *Omnia*, 261 U.S. at 508-510). If a contract is merely injured or destroyed by government action, the interference does not constitute a taking, however, if the contract is taken for public use, then the interference constitutes a taking. *See Omnia*, 261 U.S. at 510; *United States v. 677.50 Acres of Land*, 420 F.2d 1136, 1139 (10th Cir. 1970). Although Senate File 2330 may frustrate the purpose of HCP's contracts and defeat HCP's subjective expectations, Senate File 2330 neither appropriates or commandeers the contracts nor takes the contracts for public use. *See Omnia*, 261 U.S. at 513 (distinguishing between frustration of purpose and appropriation). Therefore, the court concludes that Senate File 2330 will not constitute a taking of HCP's contracts.

[15] At trial, HCP asserted that the court should apply the rational basis standard and it never asserted that strict scrutiny is appropriate. The court finds that the rational basis

(continued...)

48

## A. *Equal Protection Clause*

"When an equal protection claim is neither based on a 'suspect class' or grounded in a fundamental right, it is subject to a rational basis review." *Gilmore v. County of Douglas*, 406 F.3d 935, 937 (8th Cir. 2005) (citing *Carter v. Arkansas*, 392 F.3d 965, 968 (8th Cir. 2004) and *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446-47 (1985)); *see also Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955). Under the rational basis standard, the court "'presumes legislation is valid and will sustain

---

[15](…continued)

standard is appropriate. *See Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 107 (2003) (applying rational basis review to a statute that taxed slot machines at racetracks at thirty-six percent and slot machines on riverboats at twenty percent and concluding that the statute did not violate the Equal Protection Clause of the United States Constitution), *rev'g* 648 N.W.2d 555 (Iowa 2002), *remanded to* 675 N.W.2d 1 (Iowa 2004). In *Fitzgerald v. Racing Association of Central Iowa*, 539 U.S. at 107, the Supreme Court stated: "The Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." 539 U.S. at 107 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11-12 (1992)). On remand, the Iowa Supreme Court, while purporting to apply the rational basis standard, applied a rational basis standard that is inconsistent with Supreme Court precedent. *Compare Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d at 7-8 (holding that the state interest must be "*realistically* conceivable" and have a "basis in fact"), *and id*. at 7-8 n.3 (requiring that the policy reason be credible, that is, not specious), *and id*. at 8 n.4 (indicating that the court "will undertake some examination of the credibility of the asserted factual basis for the challenged classifications rather than simply accepting it at face value"), *with FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993) ("Where there are plausible reasons for Congress' action, our inquiry is at an end.") (internal quotation marks omitted), *and id*. at 315 ("Moreover, because [the Supreme Court] never require[d] a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.").

it if the classification drawn by the statute is rationally related to a legitimate [government] interest.'" *Gilmore*, 392 F.3d at 939 (citing *Chance Mgmt., Inc. v. South Dakota*, 97 F.3d 1107, 1114 (8th Cir. 1996), in turn, citing *City of Cleburne*, 473 U.S. at 440). The Supreme Court stated:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. *Tigner v. State of Texas*, [310 U.S. 141 (1940)]. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. *Semler v. Dental Examiners*, [294 U.S. 608 (1935)]. The legislature may select one phase of one field and apply a remedy there, neglecting the others. [*Am. Fed'n of Labor v. Am. Sash & Door Co.*, 335 U.S. 538 (1949)].

*Williamson*, 348 U.S. at 489. "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic process." *City of Cleburne*, 473 U.S. at 440. "Indeed, 'a legislative choice . . . may be based on rational speculation unsupported by evidence or empirical data.'" *Carter*, 392 F.3d at 968 (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Senate File 2330 must be upheld "'if there is any reasonably conceivable state of fact that could provide a rational basis for the classification.'" *See Koscielski v. City of Minneapolis*, 435 F.3d 898, 901 (8th Cir. 2006) (quoting *Beach Commc'ns*, 508 U.S. at 313 and *Bannum Inc. v. City of St. Charles*, 2 F.3d 267, 271 (8th Cir. 1993)); *Carter*, 392 F.3d at 968 (citing *Knapp v. Hanson*, 183 F.3d 786, 789 (8th Cir. 1999)).

To prove a violation of the Equal Protection Clause, HCP must prove that the Legislature treated it differently than similarly situated entities and the different treatment

was not rationally related to a legitimate government objective.  *See Koscielski*, 435 F.3d at 901 (citing *City of Cleburne*, 473 U.S. at 439-40, *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994) and *Bannum*, 2 F.3d at 271); *Carter*, 392 F.3d at 968 (citing *Johnson v. City of Minneapolis*, 152 F.3d 859, 862 (8th Cir. 1998)).  HCP asserts that Senate File 2330 violates the Equal Protection Clause by banning TouchPlay Machines and not banning the Lottery's Pull-Tab games and slot machines, which are both somewhat similar to TouchPlay Machines.  "An equal protection analysis requires that plaintiffs be 'similarly situated to another group for purposes of the challenged government action.'" *Gilmore*, 406 F.3d at 938 (citing *Carter*, 392 F.3d at 969).  For purposes of an equal protection analysis, the plaintiff and others must be similarly situated in all relevant respects.  *Carter*, 392 F.3d at 969 (citing *Bills v. Dahm*, 32 F.3d 333, 335 (8th Cir. 1994)).  "This equal protection concept recognized that 'usually one must look to the end or purpose of the legislation in order to determine whether persons are similarly situated in terms of the government system.'" *Gilmore*, 406 F.3d at 938 (citing R. Rotunda, J. Nowak & J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 18.2 (3d ed. 1999)).  Here, the end or purpose of Senate File 2330 is to ban TouchPlay Machines, perhaps, in part, because TouchPlay Machines lacked adequate safeguards.  Thus, the purpose of Senate File 2330 might have been to limit gaming to situations without adequate safeguards. Therefore, TouchPlay Machines and the Lottery's Pull-Tab games and slot machines are not similarly situated for purposes of the Equal Protection Clause.

Even if TouchPlay Machines and Pull-Tab games or slot machines are similarly situated, HCP has the burden to prove "'that the classification is so attenuated to its asserted purpose that the distinction it draws is wholly arbitrary and irrational.'"  *See Gilmore*, 406 F.3d at 939 (quoting *Chance Mgmt.*, 97 F.3d at 1114, in turn, citing *City of Cleburne*, 473 U.S. at 446).  That is, HCP must negate "'every conceivable basis which

might support' the classification." *See id.* (citing *Indep. Charities of Am., Inc. v. Minnesota*, 82 F.3d 791, 797 (8th Cir. 1996), in turn, citing *Beach Commc'ns*, 508 U.S. at 315). Here, the Legislature decided to eliminate TouchPlay Machines, a permissible form of gaming. That is, the Legislature decided to undertake an incremental reform of the gaming industry, specifically, the Legislature eliminated the form of gaming that operates like a Pull-Tab game but looks like a slot machine. The Legislature has the discretion to reform one field (TouchPlay Machines) and ignore others (Pull-Tabs, or more generally, gaming) without violating the Equal Protection Clause. *See Williamson*, 348 U.S. at 489. Therefore, HCP has not proven the State violated the Equal Protection Clause by promulgating Senate File 2330.

## B. Due Process Clause

"Substantive due process may be violated if state action either shocks the conscience or offends notions of fairness or human dignity." *Klein v. McGowan*, 198 F.3d 705, 710 (8th Cir. 1999) (citing *Weimer v. Amen*, 870 F.2d 1400, 1405 (8th Cir. 1989)). "Substantive due process claims regarding economic legislation face a highly deferential rational basis test." *Koster v. City of Davenport*, 183 F.3d 762, 768 (8th Cir. 1999) (citing *Parrish v. Mallinger*, 133 F.3d 612, 614-15 (8th Cir. 1998)). "'It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on the one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.'" *Id.* (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976)); *see also Creason v. City of Washington*, 435 F.3d 820, 824 (8th Cir. 2006) (stating that the plaintiff "must demonstrate that the government action complained of is truly irrational, that is something more than . . . arbitrary, capricious, or in violation of state law" (quoting *Klein*, 198 F.3d at 710)). "The Supreme Court recently confirmed

its reluctance to use the vague contours of the Due Process Clause to invalidate economic legislation." *Koster*, 183 F.3d at 768 (citing *E. Enters.*, 524 U.S. at 537).

Here, eliminating TouchPlay Machines while continuing to permit the Lottery's Pull-Tab games, other Lottery games and other forms of gaming is not arbitrary or capricious. Simply, TouchPlay Machines, while operating like the Lottery's Pull-Tab games, look like slot machines and bring a different experience to the user and, thus, are a different menace. Nothing about Senate File 2330 either shocks the conscience or offends notions of fairness or human dignity. Therefore, HCP has not overcome the presumption of constitutionality and has not proven a violation of the Due Process Clause.

## VIII. PERMANENT INJUNCTION

The Eighth Circuit Court of Appeals has discussed both preliminary and permanent injunctions and set forth the test for determining whether a permanent injunction is appropriate:

> In determining whether a preliminary injunction should be issued, a district court must take into account the threat of irreparable harm to the movant, the balance between this harm and the harm to the other party if the injunction is granted, the probability of the movant's success on the merits, and the public interest. *See Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). The standard for granting a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction the movant must attain success on the merits. *See Amoco Prod. Co. v. Village of Gambell, Alaska*, [480 U.S. 531, 546 n.12 (1987)].

*Bank One v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999). Here, HCP has not shown actual success on the merits on any of its four constitutional claims. Therefore, the court cannot grant permanent injunctive relief.

53

## IX.  CONCLUSION

For the foregoing reasons, it is **HEREBY ORDERED:**

(1)     The court **FINDS** in favor of Defendants Thomas J. Miller, in his official capacity as the Attorney General of the State of Iowa, and Kevin W. Techau, in his official capacity as the Commissioner of the Iowa Department of Public Safety, on each of Hawkeye Commodity Promotions, Inc's four constitutional claims;

(2)     The Clerk of Court is directed to **ENTER JUDGMENT** in favor of Defendants Miller and Techau;

(3)     Plaintiff Hawkeye Commodity Promotions, Inc's Motion for Preliminary Injunctive Relief (docket no. 4) is **DENIED**;

(4)     Plaintiff Hawkeye Commodity Promotions, Inc's Second Amended Complaint for Declaratory and Injunctive Relief (docket no. 32) is **DISMISSED** with prejudice; and

(5)     All court costs are assessed against Plaintiff Hawkeye Commodity Promotions, Inc.


**IT IS SO ORDERED.**

**DATED** this 26th day of April, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA